## UNITED STATES ex rel. GILLETT v.
### DERN, Secretary of War, et al.
### No. 6274.

United States Court of Appeals for the
District of Columbia.

Argued Nov. 7, 1934.

Decided Dec. 3, 1934.

Arthur Hellen, of Washington, D. C.,
for appellant.

Leslie C. Garnett, U. S. Atty., and H. L.
Underwood, both of Washington, D. C., for
appellees.

Before MARTIN, Chief Justice, and
ROBB, VAN ORSDEL, HITZ, and GRO-
NER, Associate Justices.

GRONER, Associate Justice.

Petitioner is an officer in the National
Guard of New York state. He served over-
seas in the 27th (New York) Division, A. E.
F., was wounded in action, returned to duty
with his unit while still overseas, and came
back to the United States in command there-
of. He was discharged from the United
States Army April 1, 1919, with the rank of
major of Infantry. In May, 1919, he was
appointed and commissioned colonel in the
New York National Guard by the Governor
of that state, and on February 28, 1920, aft-
er passing the physical and mental examina-
tion prescribed by sections 73–76 of the Na-
tional Defense Act of June 3, 1916 (39 Stat.
166 [see 32 USCA §§ 111–113, 115]), "feder-
al recognition" was extended to him and to
the state commission he held as colonel in
the National Guard, and on June 10, 1921,
he was commissioned colonel in the Officers'
Reserve Corps, United States Army, pursu-
ant to the provision of section 37 of the act
(see 10 USCA § 351 et seq.). On July 6,
1926, he was promoted to the rank of briga-
dier general of the line of the National
Guard of the state of New York and was
extended federal recognition in that rank.
And on February 2, 1927, he was commis-
sioned a brigadier general in the Officers'
Reserve Corps, United States Army, by the
President, acting by and with the advice
and consent of the Senate.

During all this time petitioner was re-
ceiving compensation from the United States
Veterans' Bureau for physical disability re-
sulting from wounds received in battle while
overseas. On June 7, 1928, he was placed
upon the emergency officers' retired list pur-
suant to the provisions of the Act of May
24, 1928 (45 Stat. 736), and ever since has
been, and now is, drawing the retired pay of
a major of the United States Army through
the medium of the Veterans' Bureau.

On March 4, 1933, Congress passed the War Department Appropriation Act (47 Stat. 1571) and appended thereto a proviso as follows:

"No part of the appropriations made in this Act shall be available for pay, allowances, or traveling or other expenses of any officer or enlisted man of the National Guard who may be drawing a pension, disability allowance, disability compensation, or retired pay from the Government of the United States: Provided, That nothing in this provision shall be so construed as to prevent the application of funds herein contained to the pay, allowances, or traveling expenses of any officer or enlisted man of the National Guard who may surrender said pension, disability allowance, disability compensation, or retired pay for the period of his service in the National Guard: Provided further, That present adjutants general who may be drawing such emoluments may be continued in a federally recognized status without pay under this Act." Section 1 (47 Stat. 1589).

Petitioner having elected not to surrender his pension, the National Guard Bureau, War Department, acting through its Chief and under the authority of the Secretary of War, terminated as of June 30, 1933, the federal recognition theretofore extended to petitioner and his state commission. Petitioner obtained from the Supreme Court of the District of Columbia an order directing the Secretary of War and the Chief of the Bureau to show cause why mandamus should not issue directing them to rescind their acts and restore petitioner's federal recognition. Respondents answered; petitioner demurred to the answer; and, after hearing, the court overruled the demurrer, denied the application for mandamus, and dismissed the petition. This appeal was then taken. The state of New York, through its Attorney General, has filed a brief as amicus curiæ in support of the petition, and tells us that the withdrawal of federal recognition from a commissioned officer in its organized militia will disrupt the proper training of the 10,000 troops required to be maintained by the state Constitution. The decision is, therefore, of importance not only to petitioner and the state of New York but to National Guard officers of most, if not all, of the other forty-seven states.

The sixteenth clause of the eighth section of article 1 of the Constitution confers on the Congress the power "to provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." By Act of May 8, 1792, R. S. § 1625, et seq., Congress provided for the organization of a state militia, and, as early as 1808, appropriated money to be used for the purchase of arms and equipment to be distributed among the several states, the District of Columbia, and the territories; and thereafter from time to time until 1903 increased the appropriation for arms, changed and modified the methods of organization, authorized the use of government owned land for training, provided for detail to the militia of Regular Army officers as instructors; and following the Spanish-American War, by Act of January 21, 1903—the Dick Act (32 Stat. 775)—repealed many of the former provisions affecting the militia and provided more liberal treatment so far as supplying money and materials.

While the European War was in progress, Congress again—June 3, 1916—passed a general statute in relation to the militia, known as the National Defense Act (39 Stat. 166). The act was designed to be a general law or code dealing with the militia of the states and their relations with the United States, and in section 74 (see 32 US CA § 111) the term "recognition," as applied to National Guard officers, first appears. By the provisions of this act and amendments thereto not important here, Congress prescribed various rules and regulations in relation to the discipline and training of the National Guard, established a National Guard Bureau in the War Department, imposed certain physical and professional tests as qualifications for officers, and provided an appropriation to pay the officers and men while undergoing field and armory training.

Under the provisions of this act, petitioner, as brigadier general in the New York National Guard, was charged with the duty of instructing in military science the infantry regiments maintained by the state as part of its National Guard. He likewise had authority over the fiscal affairs of certain of the armories in the state and supervisory authority over federal military property and supplies loaned or furnished the state by the federal government. When Congress inserted in the appropriation bill the provision which we have heretofore quoted, petitioner was a National Guard officer by appointment of the Governor of New York under an applicable state statute.

He was given the option of surrendering his pension or losing his federal status. He declined to forego the pension, and the action on the part of the War Department followed.

▮ From all that appears above, it is clear that Congress, in carrying out its constitutional powers, had almost from the beginning provided by law for organizing, arming, and disciplining the militia, and that the process has been one of gradual enlargement, the United States assuming constantly increasing responsibility and exercising more and more control in organization and discipline, but it is clear notwithstanding all of this, that except when employed in the service of the United States, officers of the National Guard continue to be officers of the state and not officers of the United States or of the Military Establishment of the United States. And this limitation of power was always recognized by the Congress. The United States has not appointed, and constitutionally cannot appoint or remove (except after being called into federal service), officers of the National Guard, for there must be a State National Guard before there can be a National Guard of the United States, and the primary duty of appointing the officers is one of the powers reserved to the states. But while this is true, it is also true that Congress has authority to determine the extent of the aid, support, and assistance which shall be given the National Guard of the various states and the terms upon which it shall be granted. Houston v. Moore, 5 Wheat. 16, 5 L. Ed. 19. This flows from the power to organize, arm, and discipline. But, except when employed in the service of the United States, the whole government of the militia is within the province of the state, and this follows because of the precise limitations of the constitutional grant. The United States may organize, may arm, and may discipline, but all of this is in contemplation of, and preparation for, the time when the militia may be called into the national service. Until that event, the government of the militia is committed to the states. People v. Hill, 126 N. Y. 497, 27 N. E. 789. From this it follows that petitioner's argument that he is an officer of the Army and subject to discipline or removal in accordance with the Articles of War is without foundation. Nor is there any more doubt that Congress has the power to withhold federal recognition from all or any part of the militia in its discretion, or to impose the conditions of its acceptance. This power is a necessary attribute of the constitutional grant. Therefore the question, and—as we view this controversy—the only question is, Has it done so? Petitioner relies on the Act of June 15, 1933 (48 Stat. 153, 155) for a negative to this query. He says that act is plain and unambiguous and covers the whole subject of the earlier acts in relation to the state militia and shows by its terms that it was not only a substitute for the earlier acts but was intended to cover the whole subject and to prescribe the only rules in respect thereto, and he points out that by its terms it provides for and prescribes exactly when and how federal recognition may be withdrawn from National Guard officers. All of this is quite true, and the act undoubtedly was intended as a general code of laws and regulations in relation to the militia and the so-called "National Guard of the United States." It provides for the appointment of an officer in the National Guard of the United States in the same grade as in the National Guard of the state, and also prescribes the conditions under which the commission of such an officer may be vacated; and if the question here involved cancellation of the state commission of an officer of the National Guard, we should have a very different case. But the case, as we have seen, involves no cancellation or withdrawal of petitioner's commission as a brigadier general of the line of the New York National Guard, nor does it affect it.

▮ What Congress has said in the proviso to the appropriation bill is that no part of the money appropriation shall be available for pay, allowances, or the expenses of an officer or enlisted man of the National Guard who is drawing a federal pension, unless such officer shall surrender the pension. By a proviso it distinguishes between an officer of the line and the adjutants general of the states, who may "be continued in a federally recognized status without pay." As to the latter, federal recognition of their titles continues, but such pay as the federal government contributes for particular services rendered by them during the period of the year is withheld. Precisely what is included in the term "federal recognition" is left to conjecture, but presumably it embraces those and only those members or units of the National Guard who conform to the federal statutes passed to provide for organizing and disciplining the militia. But whether this be correct or not, it is clear to us that the purpose of Congress in the adoption of the rider to the appropriation bill was to prevent an officer in the National Guard

who, for any reason, is receiving a pension from the United States from continuing to receive it and at the same time receive the benefits—whatever they may be—extended to members of the state militia by the United States. As Congress, in the discharge of its constitutional right to organize, arm, and discipline, had an absolute right to determine as well as classify those whom in time of peril it would call to the service of the Nation, it likewise had a right to limit them, and there can be no particle of doubt that unless the Act of June 15, 1933, passed some three months after the appropriation bill, by implication repealed the latter, the language of the proviso is a complete answer to petitioner's contention. We think the general legislation affecting the militia embodied in the Act of June 15, 1933, was not a repeal and was never intended by Congress to be a repeal of the appropriation bill rider to which we have several times referred. The language of the former act, as we have pointed out, manifests a clear legislative intent to make certain members of the National Guard of the state militia no longer eligible for either federal recognition or federal pay—except upon the surrender of a government pension. The latter act makes general provision with respect to all categories of militia officers and provides for withdrawal of federal recognition from those who, though eligible for recognition, have become unfit or inefficient. The plan itself is modeled on the laws governing the organization of the Army of the United States, and is altogether consonant with the power to organize, arm, and discipline the militia. It furnishes tests and standards for promotion and for removal from this important arm of the national defense. It obviously was not intended to reach special cases such as are embraced within the terms of the rider to the appropriation act. For these reasons, there is no direct conflict between the two acts. Admittedly, there is no express repeal, and unless it clearly appears there is a repeal by implication, both acts should be given effect. As a general rule, a special act relating to a particular case or subject is not considered as repealed by a subsequent general law. The special act, to which we have referred from time to time, was effective only for the fiscal year 1934, but by reference to the new appropriation bill for the War Department for the subsequent year—that is to say, for the fiscal year ending June 30, 1935—we find the proviso repeated in the same words as in the former act. This in itself clearly demonstrates the congressional purpose, and seems to us to destroy much of the force of petitioner's argument. But even if this were not true, we should be obliged to hold that the general act is intended as a general plan for the regulation of the state militia. It is general legislation and in such circumstances the rule of construction, in cases in which there are no irreconcilable differences—and here there are none—is to treat the special act as an exception to the general act. See Townsend v. Little, 109 U. S. 504, 512, 3 S. Ct. 357, 27 L. Ed. 1012; Rodgers v. United States, 185 U. S. 83, 87–89, 22 S. Ct. 582, 46 L. Ed. 816; Washington v. Miller, 235 U. S. 422, 428, 35 S. Ct. 119, 59 L. Ed. 295. Petitioner's commission from the Governor of New York as a brigadier general has not been canceled or attempted to be canceled by any acts of respondents. Nor can it be. He has continued ever since and is still discharging the duties and responsibilities of that position. All that has happened is that he is ineligible to receive any pay or benefits from the United States either in drilling his brigade in the field or in the armory while the special act continues in force, and this fact has been communicated to him by the War Department by withdrawal of what is called federal recognition. If it happens that by reason of that action he is embarrassed in or prevented from performing his duties as a National Guard officer, the fact in either case flows from the exercise of a power which is not subject to challenge here. Holding as we do that the Congress had the power to prescribe the conditions on which pay should, in time of peace as well as in time of war, be provided for an officer of the militia of a state, and holding also that the intent and purpose of Congress in the passage of the rider to the appropriation bill were to except from the persons entitled to such pay those former officers in the national forces of the United States who then were drawing gratuities or pensions, and that the act is not repealed by the subsequent amendment to the National Defense Act and is therefore still in force, it follows that the court below was correct in refusing mandamus.

Affirmed.