**First Lieutenant Andrew
HOLMES, Plaintiff,**

v.

**CALIFORNIA ARMY NATIONAL GUARD; Major Tandy K. Bozeman, in his official capacity; Governor Pete Wilson, in his official capacity; United States Army National Guard; United States of America; and William J. Perry, Secretary of Defense, in his official capacity, Defendants.**

No. C 95–688 SBA.

United States District Court,
N.D. California.

March 29, 1996.

Todd E. Thompson,* L. Jay Kuo,* Howard, Rice, Nemerovski, Canady, Falk & Rabin, San Francisco, CA, Paul Freud Wotman,* Law Offices of Paul Wotman, San Francisco, CA, for plaintiff.

Frank W. Hunger, Assistant Attorney General, Mark T. Quinlavin, Special Asst. United States Attorney,* U.S. Dept. of Justice, Washington D.C., for defendants United States Army National Guard, United States of America, William J. Perry, Secretary of Defense.

Daniel E. Lungren, Attorney General of the State of California, Andrew F. Loomis, Deputy Attorney General,* Sacramento, CA, for defendants California Army National Guard, Major Tandy K. Bozeman, Governor Pete Wilson.

### ORDER

ARMSTRONG, District Judge.

### OVERVIEW

Plaintiff, First Lieutenant Andrew Holmes ("plaintiff" or "Lt. Holmes") brings this action to challenge his discharge from the California Army National Guard ("CANG") and the United States Army National Guard ("USANG"). Lt. Holmes was expelled from service pursuant to the military's current policy governing homosexuals after plaintiff acknowledged his homosexuality to his commanding officer. Plaintiff has named two sets of defendants; the USANG, the United States of America, William J. Perry, and Secretary of Defense (collectively referred to as the "Federal defendants"), and the CANG, Major Tandy Bozeman, and Governor Pete Wilson (collectively referred to as the "California defendants"). His amended complaint alleges claims based on state and federal law.

Presently before the Court are: (1) the California defendants' Motion to Dismiss First Amended Complaint Pursuant to Rules 12(b)(6) and 12(e); (2) the Federal defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment; (3) and plaintiff's Cross-motion for Summary Adjudication as to Federal Defendants and Motion for Summary Adjudication as to California Defendants. Having read the papers filed in connection with these motions and considered the arguments of counsel, the Court GRANTS IN PART AND DENIES IN PART each of the parties' motions.

### BACKGROUND

### I. *Military Policy Regarding Gays*

The United States Military has a long history of precluding homosexuals from serving in this country's armed forces. It was not until 1981, however, that the Department of Defense formalized its policy with the implementation of revised DOD Directive 1332.14 (1981) which mandated the discharge of all known homosexuals from military service. Through this Directive, the military officially stated for the first time that "[h]omosexuality is incompatible with military service." DOD Directive 1332.14 (1981).

On July 19, 1993, President Clinton announced a new compromise policy regarding homosexuals in the military.[1] The principal elements of this new policy were enacted by

---

* Appeared and argued motions.

**1.** K. Williams, *Gays in the Military: The Legal Issues,* 28 U.S.F.L.Rev. 919, 920–21 (1994) (discussing history of the military's ban on homosexual service members).

Congress in the National Defense Authorization Act of Fiscal Year 1994 ("the Act"), codified at 10 U.S.C. § 654 (Supp.1994). The Act was signed by President Clinton on November 30, 1993. On December 21, 1993, the Department of Defense ("DOD") promulgated regulations implementing the new policy. These regulations were later modified and became effective on February 28, 1994. *See* DOD Directive 1332.14 (1994) (Enlisted Administrative Separations); DOD Directive 1332.30 (1994) (Separation of Regular Commissioned Officers); DOD Directive 1304.26 (1994) (Qualification Standards for Enlistment, Appointment and Induction). The Act and the companion DOD Directives are colloquially referred to as the "Don't Ask, Don't Tell" policy.

The Act contains six subsections, with the main "policy" provisions set forth in subsection (b). Subsection (b) reads as follows:

(b) Policy.—A member of the armed forces *shall be separated* from the armed forces under regulations prescribed by the Secretary of Defense if *one or more of the following findings* is made and approved in accordance with procedures set forth in such regulations:

(1) That the member has engaged in, attempted to engage in, or solicited another to engage in a *homosexual act* or acts *unless* there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that—

(A) such conduct is a departure from the member's usual and customary behavior;

(B) such conduct, under all the circumstances, is unlikely to recur;

(C) such conduct was not accomplished by use of force, coercion, or intimidation;

(D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and

(E) the member does not have a propensity or intent to engage in homosexual acts.

(2) *That the member has stated that he or she is a homosexual or bisexual, or words to that effect,* unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

(3) That the member has married or attempted to marry a person known to be of the same biological sex.

10 U.S.C. § 654(b) (Supp.1994) (emphasis added).[2] The primary justification for these measures is that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standard of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15) (Supp.1994).

The DOD's implementing Directives 1332.14 and 1332.30 are comparable to the Act.[3] These regulations provide, in relevant part, as follows:

Homosexual conduct is grounds for separation from the Military Services.... *Homosexual conduct includes homosexual acts, [or] a statement by a member that demonstrates a propensity or intent to engage in homosexual acts ....* A statement by a member that demonstrates a propensity or intent to engage in homo-

---

**2.** A *"[h]omosexual act"* is defined as *"[a]ny bodily contact,* actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires, and ... [a]ny bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described ... above." *See* DOD Directive 1332.30 at 1–1 (emphasis added); 10 U.S.C. § 654(f)(3)(A) & (B) (Supp.1994).

**3.** DOD Directive 1332.14, which applies to enlisted personnel, is substantially similar to DOD Directive 1332.30, which applies to officers. Since Lt. Holmes was an officer at the time of his discharge, the Court's discussion will focus on DOD Directive 1332.30.

sexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts. *A member's sexual orientation is considered a personal and private matter, and it is not a bar to continued service* under this section unless manifested by homosexual conduct in the manner described in section C.1.

*See* DOD Directive 1332.30 at 2–1 (emphasis added); DOD Directive 1332.14 at 1–9.

Under the new policy, the military no longer actively initiates investigations of service members to determine whether they are homosexual, DOD Directive 1332.30 at 8–1, and prospective new recruits are no longer questioned about their sexual orientation, DOD Directive 1304.26 at 1–5. However, a service member may not voluntarily acknowledge that he or she is gay without significant consequences.

If a service member states that he or she is homosexual, that statement alone creates a "rebuttable *presumption* that the [s]ervice member engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." DOD Directive 1332.14 at 1–10; *Id.* 1332.30 at 2–2 (same language applied to officers). The service member will be discharged *unless* he or she can prove by a preponderance of the evidence that "he or she does not engage in, have a propensity to engage in or intend to engage in homosexual acts." DOD Directive 1332.14 at 1–10, 4–3; *Id.* 1332.30 at 2–2, 2–3.

## II. *Facts and Proceedings*
### A. *Lt. Holmes' Role in the CANG and USANG*

The material facts of this case are not in dispute. Lt. Holmes was an officer in the CANG and the USANG. He enrolled in the CANG in 1986. (Holmes Decl. ¶ 2.) In March 1989, he was sworn in as an officer of the CANG, and thereafter, as an officer in the USANG. (*Id.*) During his tenure with the CANG, Lt. Holmes was promoted to First Lieutenant and received the Army Achievement Medal, the Army Reserve Components Achievement Medal and the National Defense Service Ribbon while deployed to Germany in support of Operation Desert Shield and Operation Desert Storm. (*Id.* ¶ 3, 4.) His performance ratings have been uniformly exemplary, and his unit has been characterized as a "shining example of cohesion." (*Id.* ¶ 4.)

On June 3, 1993, Lt. Holmes sent a memorandum to his CANG commanding officer which stated that, "[A]s a matter of conscience, honesty and pride, I am compelled to inform you that I am gay." On that basis, Lt. Holmes' commanding officer initiated a request that Lt. Holmes' federal recognition as an officer be withdrawn. (*Id.* ¶¶ 5–6.)

On May 21, 1994, discharge proceedings were commenced against Lt. Holmes. The Federal Recognition Board ("the Board") considered his case under the new policy purporting to exclude gays from the military based on their conduct. (*See* Administrative Record.) The Board found that Lt. Holmes' admission that he is gay created a rebuttable presumption that he had engaged in or was likely to engage in homosexual acts, and that Lt. Holmes had failed to rebut that presumption. Despite Lt. Holmes' outstanding record of service, the Board recommended the withdrawal of his federal recognition. Based solely upon the loss of federal recognition, the CANG discharged Lt. Holmes.

### B. *The Instant Litigation*

On February 28, 1995, Lt. Holmes commenced the instant action against the Federal and California defendants. Lt. Holmes filed a First Amended Complaint on April 17, 1995 which alleges thirteen claims for relief based on federal and state law. The first seven claims are directed solely against the California defendants, and allege violations of: (1) his right to equal protection under the California Constitution; (2) his right to freedom of speech under the California Constitution; (3) his right to privacy under the California Constitution; (4) California Labor Code §§ 1101, 1102, and 1102.1; (5) California Government Code § 18500(c)(5); (6) Executive Order B–54–79; and (7) the Equal Protection Clause of the 14th Amendment to the United States Constitution.

The remaining six claims of the First Amended Complaint are premised on the United States Constitution and are alleged against all defendants. These claims are based on the doctrines of equal protection, free speech and free expression, vagueness and overbreadth, intimate associations, substantive due process, and privacy.[4] Lt. Holmes seeks, *inter alia,* a declaration that the Act and Directives are unconstitutional as applied to him under both the United States and California Constitutions, a preliminary and permanent injunction enjoining the defendants from enforcing the Act and Directives, immediate reinstatement of plaintiff's officer status with the USANG and reinstatement to the CANG.

### C. Substantive Motions Before the Court

The parties have filed various motions to resolve the claims alleged by Lt. Holmes in his First Amended Complaint. Specifically, the California defendants move for dismissal of plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[5] In their memorandum, the California defendants appear to advance the following arguments in support of their motion to dismiss: (1) plaintiff's claims are moot; (2) the California defendants are not legally responsible for Holmes' discharge because their actions are mandated by federal law; (3) plaintiff's claims are barred by the doctrine of sovereign immunity as set forth in the Eleventh Amendment; and (4) each of plaintiff's state law causes of action fails to state a claim upon which relief may be granted.

The Federal defendants have separately filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, which addresses the substantive merits of each of plaintiff's federal claims. In response, plaintiff has filed a Cross–Motion for Summary Adjudication as to Federal Defendants and Motion for Summary Adjudication as to California Defendants. Plaintiff's motion addresses his federal claims only.

In light of the myriad issues presented, the Court will first discuss whether Lt. Holmes has alleged viable state law claims against the California defendants. The Court will then address Lt. Holmes' federal claims to determine whether they are subject to dismissal, or whether they should be summarily adjudicated in favor of plaintiff. That discussion will commence with an analysis of the defenses raised by the California defendants, followed by a substantive discussion of each of the federal claims as they relate to all defendants.

Before turning to the substantive merits of plaintiff's claims, however, the Court must assess plaintiff's request to strike the California defendants' untimely opposition to plaintiff's cross-motion for summary adjudication.

### D. Plaintiff's Motion to Strike

On June 23, 1995, the Court entered a scheduling order pursuant to the stipulated request of the parties.[6] This stipulated order provided that plaintiff was required to file his opposition to the defendants' motions along with a cross-motion for summary judgment on his federal claims by June 20, 1995. The order further provided that the defendants were required to file their replies in support of their respective motions *and* their oppositions to plaintiff's cross-motion by no later than July 3, 1995. Plaintiff was required to file his replies to the defendants' oppositions by no later than July 11, 1995.

■ Plaintiff timely filed a combined opposition to the Federal defendants' motion and cross-motion for summary adjudication of his federal claims. However, the California defendants did not file their opposition to plaintiff's cross-motion until July 10, 1995, a full week after their brief was due, nor did they seek leave of the Court before doing so. Consequently, Lt. Holmes now moves to strike the California defendants' opposition to his cross-motion for summary adjudication

---

**4.** Lt. Holmes has dismissed his claim for procedural due process and his damages prayer for back pay. (*See* Pl.'s Opp'n at 2 n. 2.)

**5.** In addition to Rule 12(b)(6), the California defendants' cite Rule 12(e) as a basis for dismissing plaintiff's complaint. However, Rule 12(e) per-

tains to a motion for a more definite statement, not a motion to dismiss.

**6.** The stipulation was signed by Jay Kuo on behalf of the plaintiff, Mark Quinlavin on behalf of the Federal defendants, and Andrew Loomis on behalf of the California defendants.

of his federal claims on the ground that it was filed outside the stipulated scheduling order issued by the Court and is therefore untimely.

■ The district court has the discretion to strike untimely papers where the late-filing party fails to demonstrate excusable neglect. *Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d 1515, 1519 (9th Cir. 1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984) (district court did not abuse its discretion in striking untimely affidavits in opposition to summary judgment motion where party failed to request extension of time or show excusable neglect); *accord Mendez v. Banco Popular de Puerto Rico*, 900 F.2d 4, 7–8 (1st Cir. 1990) ("the district court was not obliged to consider appellant's untimely opposition in applying the Rule 56 standard.") (citing *Wood*, 705 F.2d at 1519). Here, the California defendants argue that while the stipulated scheduling order provided for the filing of a "motion for summary judgment", it did not contemplate a "motion for summary adjudication." As such, the California defendants argue that their opposition to plaintiff's motion was not governed by the stipulated scheduling order, and that their opposition was timely under the Local Rules then in effect.

■ The rationalization proffered by the California defendants strains credulity. The stipulated scheduling order clearly stated that plaintiff intended to file a summary judgment motion on his *federal claims*— which is precisely what plaintiff filed. The fact that the motion was styled as a motion for "summary adjudication" as opposed to a

motion for "summary judgment" is a distinction without a difference. Both motions are cognizable under Federal Rule of Civil Procedure 56 and are governed by the same standard of review. *See United States v. 1982 Sanger 24' Spectra Boat*, 738 F.2d 1043, 1046 (9th Cir.1984) (finding that the substance of a motion, as opposed to how it is styled, determines how the motion should be construed).[7] Thus, the Court finds the California defendants' proffered explanation for their failure to comply with the stipulated scheduling order issued by the Court to be unacceptable.

The California defendants' inexplicable failure to comply with the stipulated scheduling order has unnecessarily resulted in additional expenditures of resources by counsel for the plaintiff. Indeed, the California defendants' justification for the late filing comes perilously close to violating Rule 11. Under the circumstances presented, the Court finds that the California defendants' papers filed in opposition to Lt. Holmes' cross-motion for summary adjudication of his federal claims should be stricken from the record.

In any event, the Court notes that consideration of the California defendants' untimely opposition brief would not have altered the outcome of this action. Their opposition brief largely repeats the arguments raised in their motion to dismiss. Moreover, like their other papers, the California defendants' opposition contains a plethora of improper invective and ad hominem attacks on the plaintiff, and was, for the most part, lacking in any cogent legal analysis.[8]

---

7. Notably, counsel for the Federal defendants experienced no difficulty discerning that the cross-motion filed by plaintiff was the same motion envisioned in the parties' discussions, (*see* Kuo Decl. in Supp. of Mot. to Strike ¶¶ 3–5), and in the stipulated scheduling order, as evidenced by his timely filed response.

8. The California defendants' papers are replete with perjoratives and extraneous and derogatory commentary, ostensibly intended to deride plaintiff by virtue of his homosexuality. For example, in one part of his brief, California defendants' counsel, Mr. Andrew Loomis, analogizes homosexuality to "statutory rape, incest, sodomy, illicit

drug use, possession of child pornography, pederasty, bestiality, cannibalism and molesting, etc." (Cal.Defs.' Mot. to Dismiss at 17 n. 13.) In the reply filed in support of his motion to dismiss, Mr. Loomis taunts, "Mr. Holmes, what are you?" (Cal.Defs.' Reply in Supp. of Mot. to Dismiss at 15 n. 20.) Finally, defense counsel concludes his "legal argument" by asserting, "In sum, Holmes is irked that the Constitution does not recognize anything special about his own favorite nasty habits." (Cal.Defs.' Mot. to Dismiss at 25.) These are but a *few* examples of the highly unseemly and unprofessional commentary which litters the California defendants' briefs.

## DISCUSSION

### I. Standards of Review

#### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

In opposing a summary judgment motion, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, an opposition which fails to identify and reference triable facts is insufficient to preclude the Court's granting of a properly supported summary judgment motion. *See Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir.1988). Nonetheless, any inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.1987).

#### B. Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be granted unless it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994).

### II. State Law Claims

Plaintiff has advanced six claims for relief against the California defendants which are premised solely on state law. In their motion to dismiss, the California defendants contend that these claims are barred by the doctrine of sovereign immunity. The Court agrees. Under the Eleventh Amendment, federal courts are barred from deciding state law claims against a state or its officials. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984); *accord Han v. U.S. Dept. of Justice*, 45 F.3d 333, 338 (9th Cir.1995).[9] Unless a state has waived its Eleventh Amendment immunity or Congress has overridden it, a state cannot be sued regardless of the relief sought. *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (citing *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978)).

Plaintiff mistakenly relies on an exception to the doctrine of sovereign immunity known as the *Ex Parte Young* exception, which provides that the Eleventh Amendment does not foreclose claims against a state where the plaintiff seeks only prospective injunctive relief. *Ex parte Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908); *Committee to Save Mokelumne River v. East Bay Municipal Utility Dist.*, 13 F.3d 305, 309 (9th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). While the *Ex parte Young* exception may save plaintiff's federal claims, (*see* discussion *infra* at 1525), it has no application to plaintiff's state law claims. *See Ulaleo v. Paty*, 902 F.2d 1395, 1400 (9th Cir.1990). The Court therefore grants the California defendants' motion to dismiss as it relates to plaintiff's state law causes of ac-

---

9. State officials sued in their official capacity "are considered to be acting on behalf of the state, and the Eleventh Amendment therefore shields them from suit." *Coeur d'Alene Indian Tribe of Idaho v. State of Idaho*, 42 F.3d 1244, 1250 (9th Cir.1994) (citing cases).

tion, which are set forth in the First Amended Complaint as plaintiff's first through sixth claims for relief. These claims are dismissed without prejudice to plaintiff bringing said claims in the appropriate state forum.

### III. *Federal Claims*

Both the California and Federal defendants' respective motions seek dismissal of plaintiff's federal claims, while plaintiff's cross-motion seeks summary adjudication of those claims in his favor. The Court will address the merits of plaintiff's federal claims by first analyzing the arguments germane only to the California defendants. Following that discussion, the Court will discuss the merits of each of plaintiff's individual federal claims.

#### A. *Defenses Raised By the California Defendants*

##### 1. *Overview of the National Guard*

To place the California defendants' arguments in context, the Court will briefly review the structure of the CANG and its relationship to the USANG.

■ The National Guard is the modern-day equivalent of the "militia." *Maryland v. United States*, 381 U.S. 41, 46, 85 S.Ct. 1293, 1297, 14 L.Ed.2d 205, *vacated on other grounds*, 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965). The Constitution authorizes Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const., art. I, § 8, cl. 15. The Constitution also gives Congress the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." U.S. Const., art. I, § 8, cl. 16. These clauses are commonly described as the "Militia Clauses." *Perpich v. Department of Defense*, 496 U.S. 334, 337 n. 3, 110 S.Ct. 2418, 2421 n. 3, 110 L.Ed.2d 312 (1990).

From 1903 to 1933, Congress passed a series of acts and amendments which completely overhauled the state militia system.

*See id.* at 341–45, 110 S.Ct. at 2423–25. Those acts established the National Guard system, which consists of " 'two overlapping but distinct organizations' ... the National Guard of the various States and the National Guard of the United States." *Id.* at 345, 110 S.Ct. at 2425. "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Id.* Thus, National Guardsmen "now must keep three hats in their closets—a civilian hat, a state militia hat, and an army hat—only one of which is worn at any particular time." *Id.* at 348, 110 S.Ct. at 2427.

■ Officers are first commissioned in a state National Guard. "[S]election and appointment of [state] Army National Guard officers is *solely* a state responsibility." *MacFarlane v. Grasso*, 696 F.2d 217, 226 n. 4 (2d Cir.1982) (emphasis added). "Upon appointment in the Army National Guard of a State ... an individual has a State status under which he can function." *Id.* An officer commissioned as an officer into the state national guard may become an officer in the USANG upon a grant of federal recognition. 32 U.S.C. § 307(d); *Dehne v. United States*, 970 F.2d 890, 891 (Fed.Cir.1992). "Federal recognition is the acknowledgement by the Federal Government that an officer [of the state militia] appointed, promoted, or transferred to an authorized grade or position vacancy in the Army National Guard [of the United States] meets the prescribed laws and regulation[s] governing the [appointment, promotion, or transfer]." *Frey v. State of Cal.*, 982 F.2d 399, 400 n. 3 (9th Cir.), *cert. denied*, 509 U.S. 906, 113 S.Ct. 3000, 125 L.Ed.2d 693 (1993).

■ State National Guards receive federal funding by maintaining federally-recognized units; "[s]tates that fail to comply with federal regulations risk forfeiture of federal funds allocated to organize, equip and arm state Guards." *Charles v. Rice*, 28 F.3d 1312, 1315–316 (1st Cir.1994) (citing 32 U.S.C. §§ 101, 107, 108, 501 and *Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d 765, 767 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993)).

Therefore, most, if not all, states primarily commission those individuals who meet federal qualifications. *MacFarlane*, 696 F.2d at 226 n. 4; *see* Cal.Mil. & Vet.Code § 222 ("Persons to be commissioned in the National Guard shall be selected from those eligible for federal recognition. . . ."). The USANG is composed of all the federally-recognized members of the state Army National Guards. 32 U.S.C. § 101(4)(D). When not in the active service of the United States, such units are predominantly state entities and are under the command of the governor. *MacFarlane*, 696 F.2d at 226 n. 4.

Once a state officer receives a federal commission, his "capacity and general fitness" to retain his federal recognition can be investigated at any time by an efficiency board composed of commissioned officers of the Regular Military, USANG or both. 32 U.S.C. § 323(b). The findings and recommendations of such boards are reviewed by the Chief of the National Guard Bureau ("NGB"), a joint bureau of the Department of the Army and the Department of the Air Force. If the NGB agrees with a negative report from the efficiency board, the officer loses his federal recognition.

### 2. *Plaintiff's Claims Are Not Moot*

 Article III of the Constitution limits federal judicial power to "Cases" and "Controversies." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). Under this limitation, "a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (citing *Geraghty*, 445 U.S. at 396, 100 S.Ct. at 1208-09); *accord Western Oil and Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1290 (9th Cir.1990), *cert. denied*, 498 U.S. 1067, 111 S.Ct. 784, 112 L.Ed.2d 846 (1991). When a matter becomes moot, the Court no longer has jurisdiction over the action. *County of Los Angeles v. Davis*, 440

U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

 In the instant case, the California defendants maintain that this action should be dismissed as moot because plaintiff has admitted that he has engaged in homosexual acts, and hence, cannot regain his federal recognition. (Cal.Defs.' Mot. to Dismiss at 4–5.) This contention lacks merit. The California defendants cite no authority, evidentiary or otherwise, to support this assertion. In fact, the only "act" which plaintiff has engaged in is acknowledging that he is gay.[10] Since plaintiff is challenging the constitutionality of the military's policy which effectively equates an acknowledgement of status with proscribed conduct, the issues before the Court are "live" for jurisdictional purposes. The Court therefore rejects the California defendants' mootness argument.

### 3. *The California Defendants' Preemption Defense Lacks Merit*

The California defendants next contend that they cannot be held liable for Holmes' discharge because they were bound by the Federal defendants' decision to withdraw Holmes' federal recognition, and that their discharge of plaintiff was simply a "ministerial" act. (*See* Cal.Defs.' Mot. to Dismiss at 2, 5–8.) In support of this contention, the California defendants' rely primarily on 32 U.S.C. § 324(a), which they assert directly compels the states to discharge National Guard officers who lose their federal recognition. They also cite 10 U.S.C. § 654(b) as necessarily preempting state regulation of the National Guard members—even when the Guard is in state service.

#### a. *32 U.S.C. § 324(a)(2)*

 Section 324(a) provides that "[a]n officer of the National Guard shall be discharged when . . . his Federal recognition is withdrawn." 32 U.S.C. § 324(a)(2). It is not readily apparent to which National Guard (in this case, CANG or USANG) the statute

---

**10.** The California defendants also make much of plaintiff's admission that he would otherwise engage in homosexual conduct but for the policies in place. Far from demonstrating that plaintiff intends to engage in proscribed conduct, this statement indicates that plaintiff intends to conform his conduct to the military's regulations. The fact that plaintiff might act differently if such actions were permitted is irrelevant.

refers. Nevertheless, the California defendants assert that "loss of federal recognition means automatic discharge from the California National Guard." (Cal.Defs.' Mot. to Dismiss at 6.)

At first blush, the definitions applicable to Title 32 arguably support the California defendants' interpretation. The United States Code defines " 'National Guard' [to mean] the *Army National Guard* and the Air National Guard." 32 U.S.C. § 101(3). " 'Army National Guard' means that part of the *organized militia of the several States....* " 32 U.S.C. § 101(4) (emphasis added). The Army National Guard is distinguished from the "Army National Guard of the United States." 32 U.S.C. § 101(5). Thus, the California defendants correctly state that section 324(a) can be read to regulate the discharge of officers from *state* National Guards.

■ Notwithstanding the above, the Court disagrees with the California defendants that state compliance with section 324(a) is necessarily compelled by the Supremacy Clause. "The termination of the appointment of a commissioned officer of the National Guard is a function of the State authorities." 32 U.S.C. App. § 1101.5. Consistent with this authority, this Circuit in *Frey* explicitly recognized that the power of appointing or terminating a state National Guard officer is a matter left to the states. *Frey*, 982 F.2d at 402 (citing cases and statutes); *see also U.S. v. Dern*, 74 F.2d 485, 487 (D.C.Cir.1934) ("The United States has not appointed, and constitutionally cannot appoint *or remove* (except after being called into federal service), officers of the National Guard....") (emphasis added). Although the loss of federal recognition precludes the officer's membership in the National Guard of the United States, the officer may still be a member of the National Guard of the state. *See MacFarlane*, 696 F.2d at 226 n. 4.

Indeed, direct federal control over state militia personnel decisions, through the granting and withdrawing of "federal recognition," would completely eviscerate the appointment power reserved to the states in the Militia Clauses. Therefore, section 324(a) would be constitutionally infirm if, as the California defendants urge, it requires the discharge of a *state*-appointed officer in *state* service merely for losing *federal* recognition.

Section 324(a) does *not* purport to preempt state law. Rather, it regulates the states only indirectly, as part of a conditional spending program. "State control in administering matters such as training, *personnel*, logistics, doctrine, and military justice has been eliminated *by a system of federal conditional spending*." P.T. Mullins, *The Militia Clauses, the National Guard, and Federalism: A Constitutional Tug of War*, 57 Geo. Wash.L.Rev. 328, 343 (1988) (emphasis added).

> The only effective control exercised by the federal government and the regular armed forces relative to organizing, equipping, training and policies of the National Guard of any of the States *comes from the control of the funds* which may be granted to or withheld from the National Guard units pursuant to granting or withdrawing federal recognition.

*Don't Ruin Our Park v. Stone*, 749 F.Supp. 1386, 1388 (M.D.Pa.1990) (emphasis added); 32 U.S.C. § 108 (President may withhold federal funds if state fails to comply with any Title 32 provision); *accord Charles*, 28 F.3d at 1315; Mullins, *supra*, at 343 ("This purse string has been used to put the states in a 'catch-22' situation—retain autonomy and lose funding or accept funding and submit to federal control.").

Through the federal recognition system, Congress has effectively circumvented the Militia Clauses' limitation on federal control of militia personnel. Unable or unwilling to forego federal funding, states have voluntarily restrained the exercise of their appointment power by primarily commissioning individuals who are eligible for federal recognition. Thus, even though federal recognition ostensibly does not occur until *after* the state has appointed an officer, in practical effect, federal recognition determines who may receive a state commission. Similarly, states are effectively forced to discharge or transfer officers who lose their federal recognition in order to preserve federal recognition and funding of the officers' units. Nonetheless, at least with respect to

personnel decisions, states ultimately *choose* to comply with federal National Guard policies.[11] At the risk of losing funding, states are free to break from § 324(a) and to retain in state service officers who lose their federal recognition.[12] *See MacFarlane,* 696 F.2d at 226 n. 4.

This fact is illustrated by the experience of at least one National Guard officer who lost his federal recognition but continued to serve in the California military. In *Frey,* 982 F.2d 399, Colonel Archer Frey brought suit against the state under federal age discrimination laws after being discharged for reaching a state-imposed mandatory retirement age. Frey lost his federal recognition in 1985 because he had attained 30 years of commissioned service. However, "[f]rom 1985 until his mandatory retirement [in 1991], Frey served ... as a military officer in the California National Guard." *Id.* at 400.

The court noted, "As in Frey's case, one may be a member of the State National Guard, but not a member of the Army or Air National Guard of the United States." *Id.* at 400 n. 2. The court described the effects of loss of federal recognition:

> The loss of federal recognition means that the officer no longer participates in federally-paid duty status, which includes activities such as drills, annual training, or service schools at any cost to the federal government, nor may he be called into active federal service.

*Id.* at 400 n. 3. Significantly absent from this list of consequences is "automatic discharge." Such a consequence would in fact render the enumerated consequences irrelevant.

*Frey* directly contradicts the California defendants' assertion that they must invariably follow and mechanically apply § 324(a). Colonel Frey's experience demonstrates that loss of federal recognition is not an absolute bar to service in California's National Guard. *See* 11 Ops.Cal. Att'y Gen. 253, 261 (1948)

("Withdrawal of federal recognition does not deprive the officer of his state commission."). Indeed, California law authorizes the commissioning of certain previously-discharged officers who "are no longer eligible for federal recognition." Cal.Mil. & Vet.Code § 222. In contrast, no California statute expressly requires the discharge of an officer who loses federal recognition.

The California defendants fail to appreciate the role of conditional spending in Congress' regulation of the state Guards, and their interpretation of § 324(a) burdens the statute with a serious constitutional infirmity. Furthermore, the California defendants' position is contradicted by a recent example of noncompliance with § 324(a). Therefore, the Court rejects the California defendants' argument that section 324(a) left them with no choice but to discharge Holmes.

### b. *10 U.S.C. § 654(b)*

■ The California defendants also contend that they had no control over Holmes' discharge because the federal government's anti-homosexual policy (10 U.S.C. § 654(b)) controls "[i]n both the state and federal 'halves' of the National Guard...." (Cal. Defs.' Reply at 16.) For this proposition, they apparently rely on *Johnson v. Orr,* 617 F.Supp. 170 (E.D.Cal.1985), *aff'd,* 787 F.2d 597 (9th Cir.1986). In *Johnson,* a lesbian member of the California National Guard was discharged, pursuant to the federal military regulations that preceded the present policy, after informing her commander of her sexual orientation. The district court, without citing any authority other than the text of the Militia Clauses, ruled that federal regulations applied to National Guard officers even in their *state* capacity by virtue of Congress' power to "discipline" the militia. *Johnson,* 617 F.Supp. at 177 (emphasis added). The Ninth Circuit affirmed in an unpublished decision. *See* 787 F.2d 597 (9th Cir.1986).

---

**11.** The Court expresses no opinion as to whether federal control over organization, training, and discipline also depends upon Congress' conditional spending program, or whether present National Guard policies in these areas flow from the powers granted to Congress in the Militia Clauses.

**12.** An alternative course of action is to transfer the officer to a position that does not require federal recognition, thus preserving federal recognition (and therefore, funding) of the officer's former unit.

More recent Supreme Court and Ninth Circuit cases, however, suggest that *Johnson* is no longer reliable authority. In *Gilliam v. Miller*, 973 F.2d 760 (9th Cir.1992), two plaintiffs brought suit after being discharged from the Oregon Army National Guard ("ORARNG") for failing to comply with federal military weight control regulations.[13] Attempting to state a claim under the federal Administrative Procedure Act, the plaintiffs argued that the Oregon Adjutant General acted as a federal agent when he applied the regulations and removed them from the OR-ARNG. A magistrate judge recommended, and the district court initially approved, a finding favorable to the plaintiffs.

The Adjutant General moved for reconsideration after the Supreme Court, in its *Perpich* decision, provided a new analysis of the National Guard system. The district court granted the motion and found, pursuant to the conceptual framework articulated in *Perpich*, that the Adjutant General had been wearing his "state militia hat" when he discharged the plaintiffs. The court reversed its initial finding and dismissed the complaints for failure to state a claim.

The Ninth Circuit affirmed. Rejecting the argument that federal, not state, law controlled, the court held that the regulations were applicable to the plaintiffs not because they preempted state law, but because the state voluntarily incorporated them *into* state law. *Id.* at 761 n. 2 and 763. Thus, "the adoption of federal training requirements for members of ORARNG by the Oregon Legislature was not a sham," as it would have been if those requirements had already preempted state law. *Id.* at 763. When the Adjutant General discharged the plaintiffs from state service, he did so "solely in the capacity of a state actor," "fulfilling his role under state law," and not "under federal control." *Id.* at 764; *see Zitser v. Walsh*, 352 F.Supp. 438, 440 (D.C.Conn.1972) (where Connecticut Army National Guard colonel used a federally-promulgated regulation to determine officer's qualifications, "state law commanded him to apply that regulation").

*Gilliam* cannot be reconciled with the Ninth Circuit's decision in *Johnson*. Those cases squarely reach opposite conclusions on the question of whether regulation of the National Guard when not in federal service is a state or federal function. In addition to being a more recent case, *Gilliam* more likely expresses the Ninth Circuit's present position because it followed, and expressly relied on, the Supreme Court's analysis of the National Guard system in *Perpich. See id.* at 763–64. Therefore, this Court finds that *Gilliam* controls and that *Perpich* and *Gilliam* together have implicitly overruled *Johnson*.

In light of *Gilliam*, the California defendants cannot maintain that they acted only "ministerially" in following 10 U.S.C. § 654(b); rather, they acted under color of state law. The California defendants were required to enforce the policy only because, and indeed if, California has adopted that policy. The Court therefore rejects the California defendants' claim that § 654(b) preempted their authority over Holmes' service.

### 4. Plaintiff's Federal Claims Are Not Barred By the Doctrine of Sovereign Immunity

■ Finally, the California defendants argue that the doctrine of sovereign immunity under the Eleventh Amendment bars plaintiff's *federal* claims for relief alleged against them. The Court rejects this argument. Under the *Ex parte Young* exception, a suit against a state official seeking relief from unconstitutional state action is not a suit against the state, even if the state is the real party in interest. *Ex parte Young*, 209 U.S. at 160, 28 S.Ct. at 454; *Kentucky*, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14. "The *Ex Parte Young* exception is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Almond Hill School v. U.S. Dept. of Agriculture*, 768 F.2d 1030, 1034 (9th Cir. 1985) (internal quotation marks and citations omitted). Since plaintiff is seeking prospective injunctive relief preventing the California defendants from violating his rights under the United States Constitution, plaintiff may proceed on his federal claims against the

---

13. Like California, Oregon has adopted by stat- ute all applicable federal military regulations.

California defendants. *Demery v. Kupperman*, 735 F.2d 1139, 1146 (9th Cir.1984), *cert. denied sub. nom*, 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985).

### B. *Equal Protection*

In his Sixth and Seventh Claims for Relief, Lt. Holmes alleges that the disparate treatment of homosexual and heterosexual service members under the Act and Directives constitutes a violation of his right to equal protection under the United States Constitution. As will be set forth below, the Court finds merit to this claim and concludes that the Act and Directives: (1) impermissibly discriminate against homosexual service members on the basis of sexual orientation as opposed to homosexual conduct; (2) fail to rationally further a legitimate governmental interest; and (3) are irrational as a matter of law because they are founded on and give effect to the prejudices and biases of others. These issues will be discussed seriatim.

### 1. *The Rational Basis Test*

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. am. XIV § 1. This is essentially "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982)); *Jackson Water Works v. Public Utils. Comm'n*, 793 F.2d 1090, 1092 (9th Cir. 1986), *cert. denied*, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987). Although the Fourteenth Amendment expressly applies only to the states, the protections afforded thereunder apply equally to federal legislation, albeit through the Due Process Clause of the Fifth Amendment. *Cecelia Packing Corp. v. U.S. Dept. of Agriculture*, 10 F.3d 616, 623–24 (9th Cir.1993).

There are three levels of judicial review applicable to equal protection challenges: strict scrutiny, heightened scrutiny, and rational basis review. *High Tech Gays v. Defense Indus. Security Clearance Office*, 895 F.2d 563, 571 (9th Cir.), *reh'g denied*, 909 F.2d 375 (9th Cir.1990). This Circuit has previously held that gays are not a suspect class, and therefore, classifications affecting homosexuals as a class are subject only to rational basis review. *Id.*[14]

Under a rational basis framework, the relevant inquiry with respect to an equal protection challenge is whether the challenged action "rationally furthers a legitimate state purpose or interest." *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 55, 93 S.Ct. 1278, 1308, 36 L.Ed.2d 16 (1973); *United States v. Harding*, 971 F.2d 410, 412 (9th Cir.1992), *cert. denied*, 506 U.S. 1070, 113 S.Ct. 1025, 122 L.Ed.2d 170 (1993). "[I]f there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," the discriminatory classification is presumed valid and must be sustained. *Heller v. Doe*, 509 U.S. 312, 318–19, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). Notwithstanding the strong presumption of validity, "the standard of rationality ... must find some footing in the realities of the subject addressed by the legislation." *Id.* at 321, 113 S.Ct. at 2643.

The Court recognizes that in undertaking its analysis of plaintiff's equal protection claim, the judiciary must give deference to the military's judgment; the "military decisions by the Army are not lightly overruled by the judiciary." *Pruitt v. Cheney*, 963 F.2d 1160, 1166 (9th Cir. 1991), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992); *Rostker v. Goldberg*, 453 U.S. 57, 65, 101 S.Ct. 2646, 2651–52, 69 L.Ed.2d 478 (1981) ("it is difficult to conceive of an area of governmental activity in which the courts have less competence.") (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445–46, 37 L.Ed.2d 407 (1973)). However, while military decisions are entitled to substantial

---

**14.** Plaintiff invites this Court to revisit the issue of whether homosexuals are a suspect class, based on new evidence that sexual orientation is genetic and an immutable characteristic. (*See* Pl.'s Opp'n and Cross–Mot. at 8 n. 9.) However, as the Court finds that the military's current policy lacks any rational basis, the Court finds it unnecessary to reach this issue.

deference, such deference should not be construed "to say that Congress is free to disregard the Constitution when it acts in the area of military affairs." *Rostker*, 453 U.S. at 67, 101 S.Ct. at 2653. The military is not the final arbiter of the constitutionality of its policies, and it must operate within the parameters established by statute and the Constitution. *Id.; Goldman v. Weinberger*, 475 U.S. 503, 523, 106 S.Ct. 1310, 1321, 89 L.Ed.2d 478 (1986) (Brennan, J., dissenting) ("It is not the province of the federal courts to second-guess the professional judgments of the military services, but we are bound by the Constitution to assure ourselves that there exists a rational foundation for assertions of military necessity.").

### 2. The Policy Unconstitutionally Discriminates on the Basis of Status

#### a. Conduct is Equated With Status

 The threshold issue presented with respect to plaintiff's equal protection claim is whether the policy excludes service members only on the basis of homosexual *conduct*, or whether it discriminates against homosexuals based on their *status* (i.e., sexual orientation). In the context of military service, the Ninth Circuit has recognized that it is "constitutionally permissible" to exclude service members based on "homosexual *conduct*." *Meinhold v. U.S. Dept. of Defense*, 34 F.3d 1469, 1477 (9th Cir.1994). This Circuit, however, has also held that a discharge based on the service member's "*status* as a homosexual" states an equal protection claim. *Pruitt*, 963 F.2d at 1164 (emphasis added); *Meinhold*, 34 F.3d at 1477.

The Federal defendants assert that the new policy addresses homosexual *conduct*, not homosexual *status* or *orientation*.[15] Yet, the actual language of the policy belies this assertion. The Directives define "*sexual orientation*" as "[a]n abstract sexual prefer-

*ence* for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts." DOD Directive 1332.30 at 1–2 (emphasis added). "*Propensity* to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates *a likelihood that a person engages in or will engage in homosexual acts*." *Id.* at 1–1 (emphasis added).

However, the policy further provides that a service member's or officer's statement "that he or she is a homosexual" by itself "demonstrates a propensity or intent to engage in homosexual acts, . . ." *Id.* at 2–1, 2–2. In other words, acknowledging one's homosexual orientation is equated with a "propensity" to engage in homosexual acts, which, in turn, is deemed sufficient to warrant expulsion from the military. The policy thus *collapses* that which it purports to treat as distinct. Certainly, if "orientation" or "status" and "propensity" are genuinely distinct concepts under the new policy, the former would not be used to define the latter. "Neither the Act nor the Directives explain how to differentiate an 'orientation' from a 'propensity,' *although the Act's avowed policy to insure that 'homosexual orientation' not be treated as a 'bar' to service would seem to make such differentiation crucial*." *Able v. United States*, 880 F.Supp. 968, 975 (E.D.N.Y.1995) (emphasis added).

Tellingly, the military apparently recognizes the questionable nature of the distinction the policy attempts to create between status and conduct. During the Senate Committee hearings, the military conceded that the possibility that a service member can "have the orientation without the propensity" is only a "hypothetical" one. S.Hrg. 103–845 at 800. The military further recognized that a mere declaration of sexual orientation, such as "I am gay," is tantamount to homosexual conduct, even though there is no evidence of such conduct:

> Senator COHEN: Okay. So let me come back to the final point. We have a

---

**15.** The Department of Defense is cognizant of the constitutional flaws inherent in a status-based policy. During the Senate hearings, Jamie Gorelick, then counsel to the Department of Defense, stated during a Senate Committee hearing on the new policy that, "The reason we do not

discharge people because we believe them to have a homosexual orientation is because in 1981 it was recognized that if we did have a status-based as opposed to conduct-based rule, that it would be vulnerable to the Courts." S.Hrg. 103–845 at 777.

situation, then, where *a mere declaration that one is a homosexual, that is "conduct," under your interpretation of the rule that is going to be adopted.*

Ms. GORELICK: *That is correct.* That is consistent with the prior policy, Senator.

Senator COHEN: And even though there is *no evidence of conduct,* per se—

Ms. GORELICK: *That is correct.*

S.Hrg. 103–845 at 819 (emphasis added).

The DOD's admissions, coupled with the circuitous definitions contained in the Directives, clearly reveal that the policy is designed to—and effectively permits—the military to exclude homosexuals from military service based solely on their status or orientation. The professed focus on proscribed conduct is little more than a thinly veiled attempt to camouflage this deception under a veneer of apparent constitutionality. Any purported distinction between status and conduct under the policy is purely illusory. As such, the Act and Directives discriminate on the basis of homosexual status, and therefore, fail to comport with the notions of equal protection under the Constitution. *Pruitt,* 963 F.2d at 1164.

### b. *The Rebuttable Presumption Does Not Address the Court's Constitutional Concerns*

Defendants counter that the new policy does, in fact, treat status and conduct as separate and distinct concepts. As support for this proposition, defendants point to 10 U.S.C. § 654(b)(2), which ostensibly provides service members with the opportunity to rebut the presumption (which arises from a statement of homosexual orientation) that they intend or have a propensity to engage in homosexual conduct. Unfortunately, this "opportunity" fails to avoid the constitutional concerns of merging status with conduct because (1) service members have no meaningful opportunity to rebut the presumption, and (2) the existence and application of the presumption are constitutionally unsound.

### i. *The Presumption is Effectively Irrebuttable*

The policy does not provide a concrete method much less a realistic opportunity for a service member to prove that he or she does *not* engage in, have a propensity to engage in, or intend to engage in homosexual conduct. *Able,* 880 F.Supp. at 975 ("Neither the Act nor the Directives suggest how one who is born with an innate tendency, an 'orientation' or a 'propensity,' to commit a homosexual act can prove that he or she does not have such an orientation or propensity.") Moreover, in drafting the policy, the DOD specifically intended to foreclose a self-identified homosexual service member from rebutting the presumption by "a promise to adhere to military standards of conduct in the future." S.Hrg. 103–112 at 294. Nor can the member rebut the presumption by "a statement to the effect that he or she has a propensity towards homosexuality but has not acted on it." *Id.*

The DOD further acknowledged that the "opportunity" to rebut the presumption is only "hypothetically" possible in cases where the service member recants his statement by stating that "I was misunderstood, I did not mean it, it was a joke." S.Hrg. 103–845 at 772.[16] In other words, rebutting the presumption is *hypothetically* possible if the military is convinced that the service member really is *not* gay. *See Thorne v. United States Dept. of Defense,* 916 F.Supp. 1358, 1363–64 (E.D.Va.1996) ("Closely read, the statute is a tautology and hence the rebuttable presumption it purports to express is illusory, for it cannot be rebutted short of the declarant recanting the original statement declaring his or her homosexuality.").

The Court also finds uncompelling the seven cases cited by the Federal defendants which they assert demonstrate that service members have successfully rebutted the presumption. (*See* Fed.Defs.' Reply at 9–10; Naccarato Decl. ¶ 2; Suppl. Galligan Decl. ¶ 3.)[17] Both the Naccarato and Galligan dec-

---

**16.** Ms. Gorelick was also quick to emphasize:
The burden is placed on the service member throughout. And I would reiterate what the Secretary said yesterday, which is that is a *very high burden* and *no one has ever done it.*

S.Hrg. 103–845 at 772.

**17.** Colonel Timothy E. Naccarato is an officer in the United States Army and, at the time his declaration was prepared, was the Chief of the

larations submitted in support of the Federal defendants' motion are conspicuously silent as to the facts and circumstances of any of those cases, and more importantly, the manner in which these individuals allegedly rebutted the presumption that they engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts. Without this information, the mere contention that a handful of service members have successfully rebutted the presumption is of little, if any, probative value.[18]

### ii. *The Rebuttable Presumption Violates Equal Protection*

In any event, even if the Court were convinced that gay service members were afforded a meaningful opportunity to rebut the presumption, the Court finds that the presumption is irrational.

Preliminarily, the policy *assumes* that all service members who acknowledge their homosexuality will act in accordance with their orientation in the future and engage in proscribed conduct. This is constitutionally unacceptable. The Supreme Court has consistently found that conduct cannot be presumed to follow from a person's status. *Jacobson v. United States*, 503 U.S. 540, 551–552, 112 S.Ct. 1535, 1541–1542, 118 L.Ed.2d 174 (1992) (finding that the defendant's predisposition to act in a certain manner could "hardly support an inference" that he would commit crimes in the future); *Powell v. Texas*, 392 U.S. 514, 543, 88 S.Ct. 2145, 2159–60, 20 L.Ed.2d 1254 (1968) (Black, J., concurring) (stating that "[p]unishment for a *status* is particularly obnoxious ... because it involves punishment for a *mere propensity*, ...") (emphasis added); *United States v. Robel*, 389 U.S. 258, 265–

66, 88 S.Ct. 419, 424–25, 19 L.Ed.2d 508 (1967) (finding that membership in an organization was insufficient basis on which to impute to him the organization's improper goals). Although these cases involved criminal proceedings, they "nevertheless point out the constitutionally significant danger of making status a surrogate for prohibited conduct." *Meinhold*, 34 F.3d at 1478 (citing cases).

Second, the presumption is not applied equally to heterosexual and homosexual service members. The policy provides that the rebuttable presumption arises only in cases involving self-identified *homosexuals*, even if there is no actual evidence of homosexual conduct. Such is not the case for self-identified *"heterosexual"* service members: No presumption arises in cases involving *heterosexual* service members who admit to *engaging* in *homosexual conduct* but promise not to engage in future homosexual acts. DOD Directive 1332.20 at 2–2; S. Hearing 103–845 at 771–72; *Able*, 880 F.Supp. at 976 (citing S. Report 103–112 at 294).[19]

The Federal defendants contend that the military is justified in presuming gay service members will engage in proscribed conduct whereas their heterosexual counterparts will not because, unlike homosexual conduct, not all heterosexual acts are disallowed. (Reporter's Transcript ("RT") at 76:18–20.) They further assert that a presumption that gay status will lead to gay conduct is valid because few service members will remain celibate due to the power of the human sex drive. (*See* Fed.Defs.' Reply at 4–5 (citing S.Rep. 112 at 281, 284).) The Federal defendants note that the D.C. Circuit followed this

---

United States Army Litigation Division. (Naccarato Decl. ¶ 1.) Colonel John P. Galligan is Colonel Naccarato's successor. (Suppl. Galligan Decl. ¶ 1.)

**18.** The *Able* court explained that the incidents touted by the Federal defendants were "aberrations." The court explained:

> In one, the member had said "she thought she might be gay." In another, the member had stated "I'm kind of confused about my sexual preference." And in the third the member had said he was homosexual in what he thought was a confidential session with a Navy counselor who tried to make him "comfortable"

and as "free as possible" so as to get to the "root" of the member's problems....

> \* \* \* \* \* \*

> These three atypical results are obviously aberrations that cannot be taken to show that the Act holds out any realistic opportunity to rebut the presumption.

*Able*, 880 F.Supp. at 976.

**19.** Counsel for the Federal defendants conceded during oral argument that if a service member admitted to having committed an act of sodomy, but nevertheless insists that he or she is a *hetero sexual*, the presumption is not triggered. (RT at 67:14–23.)

reasoning in upholding the constitutionality of the new policy. *See Steffan v. Perry,* 41 F.3d 677, 690 (D.C.Cir.1994) (stating that "the human sexual drive is enormously powerful and that an open declaration that one is a homosexual is a rather reliable indicator as to the direction of one's [sex] drive.") (en banc). The *Steffan* majority assumed that homosexuals are unable to control their sexual urges. *See Steffan,* 41 F.3d at 692. Consistent with the foregoing, the Federal defendants argue that the military need not wait for the proscribed act to occur in order to prevent its occurrence, and for that reason, the existence of the rebuttable presumption is rational.[20]

The Ninth Circuit in *Meinhold,* however, expressed skepticism as to whether a policy which presumes that *homo*sexuals will engage in proscribed conduct when no similar assumption is made with respect to *hetero*sexuals can ever pass muster under the Constitution:

Here, the regulation as applied to Meinhold assumes that persons *who say they are gay,* but who have not acted in accordance with their propensity in the past, will nevertheless act in accordance with their propensity in the future—whether or not to do so is lawful or acceptable military behavior. *Yet no similar assumption is made with respect to service-members who are heterosexual.* [footnote omitted]. Although courts defer to the military's judgment about homosexual conduct, and classifications having to do with homosexuality may survive challenge if there is any rational basis for them, *see Heller v. Doe,* [509] U.S. [312], [318–22], 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993); *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 571 (9th Cir.

1990), at least *a serious question is raised whether it can ever be rational to presume that one class of persons (identified by their sexual preference alone) will violate regulations whereas another class (identified by their preference) will not.* [footnote omitted]

*Meinhold,* 34 F.3d at 1477–78 (emphasis added). The court further took issue with the military's contention that it need not wait until homosexual acts have occurred and been detected before taking personnel action:

We acknowledge the force of the DOD's argument that it need not take the risk of a person with a homosexual desire or propensity acting on it because of the critical nature of the military mission. [citations.] However, [the] DOD is prepared to take the risk that a servicemember who has committed a homosexual act *but isn't homosexual* won't do so again. *For that reason, its argument is not wholly rational. In any event, the risk factor alone does not eliminate equal protection difficulties.*

*Id.* at 1478 n. 11 (emphasis added).

The Federal defendants attempt to discount the significance of *Meinhold* on the theory that it analyzed the pre–1994 policy excluding gays altogether. (Fed.Defs.' Reply 6–7.) *Meinhold* cannot be dismissed so lightly. In *Meinhold,* the Ninth Circuit recognized that the regulations then in effect *assumed* that "persons who say they are gay, but who have not acted in accordance with their propensity in the past, will nevertheless act in accordance with their propensity in the future...." *Meinhold,* 34 F.3d at 1477–78. Notably, the new policy, vis-a-vis the rebuttable presumption, expressly states what was formerly assumed under the old policy.[21] In

---

**20.** There is no evidence that homosexuals are any less capable of controlling their desires than heterosexuals. *See Cammermeyer,* 850 F.Supp. at 919. In fact, the *Steffan* court neglected to recognize that homosexuals have a stronger incentive than heterosexual service members to refrain from proscribed sexual conduct, given the likelihood that it will lead to their expulsion from the military. *See id.; see also Constitutional Law—Equal Protection—D.C. Upholds Military Discharge Based On A Statement of Homosexual Orientation—Steffan v. Perry,* 41 F.3d 667 (D.C.Cir.1994), 108 Harv.L.Rev. 1779, 1782–83

(1995) ("Although the sexual desires of each group may be equally strong, the desires of homosexuals for sex is not necessarily greater than their desire to retain their positions in the military."). "There is no reason to believe that such improper behavior, if it occurs, would be more likely to occur because a homosexual has admitted his orientation rather than kept it a secret." *Able,* 880 F.Supp. at 978.

**21.** The Federal defendants' attempt to distinguish *Meinhold* as being decided under the for-

doing so, Congress has enacted the precise constitutional infirmity which *Meinhold* cautioned against: the conflation of homosexual status with homosexual conduct.

The Court concludes that the policy does, in fact, discriminate against homosexual service members on the basis of status. The rebuttable presumption—which is essentially irrebuttable and itself constitutionally unsound—is a vehicle employed to obscure the congruence between the current policy and the former policy. In actuality, there is no meaningful distinction in this regard, as the current policy essentially elevates form over substance. Thus, under governing jurisprudence, the Court finds that Lt. Holmes' discharge violated his right to equal protection.

### 3. *The Policy Does Not Rationally Further a Legitimate Governmental Interest*

■■■ Assuming arguendo that the military's policy affecting homosexuals is not impermissibly premised on status, the next question is whether the policy "rationally furthers a legitimate state purpose or interest." *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 55, 93 S.Ct. 1278, 1308, 36 L.Ed.2d 16 (1973). The Federal defendants assert the policy furthers the Government's interest in maintaining an effective military force. There is no dispute that this is a legitimate governmental interest. However, the parties vigorously contest whether the military's policy rationally furthers that goal.

First, the Federal defendants maintain that the new policy is necessary to "accommodate the personal privacy interests" of heterosexual service members.[22] (*See* Fed. Defs.' Mot. at 13–14.) The ostensible concern is that such privacy interests will be infringed upon by compelling heterosexual service members to live, sleep and shower with other persons who may find them sexually attractive. The military believes that heterosexual and homosexual personnel should not share billeting arrangements for essentially the same reason that men and women are separated in their personal activities.

The military's purported "privacy" justification *might* be rationally sound if the policy excluded *all* gays and lesbians from the military. However, this is not what the policy purports to do. The new policy purports to permit gays and lesbians to serve in the military, but in reality, they are allowed to serve only until such time as they reveal their sexual orientation. Consequently, the new policy does nothing to allay heterosexual service members' personal privacy concerns, given that it envisions the presence of homosexuals in the military. *See Able,* 880 F.Supp. at 978; *see also* Posner, R., *Sex and Reason* at 319 (1992) ("The most important reason for doubting that dropping the ban on homosexuals in the military would cause serious morale problems is simply that a large number of homosexuals already serve without significant difficulties.")

Second, the Federal defendants claim that the policy promotes an effective military by preventing "sexual tension." (Fed. Defs.' Mot. at 14–15.) The Federal defendants argue that same sex attractions within a military unit are "distracting," and therefore, likely to disrupt unit cohesion. (*Id.*) As in the case of the privacy rationale, the Federal defendants cite to the separation of men and women personnel and the fact that "no such accommodation can be made for homosexuals." (*Id.*)

While the prevention of sexual tension and promotion of unit cohesion are legitimate goals, the policy does not rationally further these interests. As noted, the military's regulations permit homosexuals to serve so long as they, in effect, remain celibate and conceal their sexual orientation. The "sexual attractions" and "tension" which the Federal defendants speculate will result from the presence of homosexuals will, therefore, not be curtailed under the current policy. Far from

---

mer policy is rather curious in light of the DOD's admission that the rebuttable presumption in the new policy also existed under the old policy. S.Hrg. 103–845 at 775 ("Senator, the procedure that we have described, this rebuttable presumption, has been in the directive since 1981, ....").

22. The Court notes that Federal defendants' claim that the policy advances the "privacy interests" of heterosexual service members is somewhat curious given that the policy itself recognizes that military life is often characterized by "little or no privacy." 10 U.S.C. § 654(a)(12).

promoting unit cohesion, the secrecy required under the new policy is likely to foster *increased* tension and suspicion among heterosexuals as well as suffering and misery among homosexuals. *See Able,* 880 F.Supp. at 978 ("The only difference will be that heterosexuals will not know which of their servicemates are homosexuals, and heterosexuals will have reason to have a generalized suspicion of everyone in the showers, hardly a circumstance likely to increase 'cohesion.' ").

Finally, the Federal defendants maintain that the exclusion of acknowledged homosexuals is necessary to prevent unit polarization. They claim that unit cohesion is a function of "broad cultural values, norms, and characteristics that are the result of a common socialization process and basic agreement among unit members about cultural values." (*See* Fed.Defs.' Mot. at 16 (quoting S.Hrg. 103–845 at 249)). They further contend that "when this (sic) shared cultural values of unit members breaks (sic) down, the result is a loss of unit cohesiveness with often devastating consequences." (*Id.*)

The Federal defendants do not specify the "shared cultural values" to which they are referring. Presumably, they mean the "cultural values" of heterosexual service members who dislike homosexuals or disapprove of homosexuality.[23] The flaw in this argument is that service members who are tolerant of the "homosexual lifestyle" are not foreclosed from service. Moreover, a service member who has "[a]n abstract sexual preference" for the same sex—which *is* acceptable under the policy—will no doubt be viewed with the same scorn as a homosexual service member who "engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." Stated another way, the characteristics which allegedly result in unit polarization—i.e., same-sex preferences—are shared by both "acceptable" and "unacceptable" homosexuals. The Act and Directives simply do nothing to further unit cohesion.

Notwithstanding the rationales articulated by the Federal defendants, this Court finds that there is no "conceivable basis" on which to find the policy is rational. *See Heller,* 113 S.Ct. at 2643. The DOD Directives state unequivocally that homosexual orientation "is not a bar to continued [military] service...." *See* DOD Directives 1304.14 at 1–9 and 1332.30 at 2–1. Yet, this same policy renders the single statement "I am gay"—*which is nothing more than an articulation of what is supposedly permissible*—sufficient to trigger a presumption that the service member should be excluded. *This defies logic.* The inherent incongruity between what the policy *says* and what it *does* in practice is clear evidence that the policy as a whole lacks any semblance of rationality.

### 4. The Policy is Irrational As a Matter of Law Because it is Based on Private Biases of Others

Entirely aside from the foregoing, even if the Court were to find that the policy furthered a legitimate governmental interest, the Court finds that the policy fails because it impermissibly relies on irrational prejudices against homosexuals as a group. The Supreme Court has recognized that a discriminatory classification which is based on prejudice or bias is *irrational* as a matter of law. *See Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259–60 (striking down ordinance which was based on an "irrational prejudice against the mentally retarded, ..."). As the Supreme Court recognized in *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984), "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Accord United States v. City of Hayward,* 36 F.3d 832, 835 (9th Cir.1994) ("the law should not sanction private biases.") (citations omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995). Therefore, a discriminatory policy against gays and lesbians which is based on prejudice cannot be enforced without running afoul of the

---

**23.** The essence of this argument is that unit cohesion will suffer because certain heterosexual service members dislike homosexuals. As set forth

*infra,* the personal prejudices of those service members cannot provide constitutional support for an otherwise irrational policy.

equal protection clause. *Cammermeyer v. Aspin,* 850 F.Supp. 910, 915 (W.D.Wash. 1994).

The governmental interests asserted by the Federal defendants stem from the fear and discomfort of some service members which results from their *knowledge* that homosexuals are present. However, the concern asserted by the military is simply another way of saying that the presence of homosexuals makes some service members uncomfortable. While it may be true that some intolerant heterosexual service members are uneasy in the presence of homosexuals, the Court rejects the notion that the bigotry of those service members provides a constitutionally sufficient basis to banish an entire class of persons from the military. This is also significant because it demonstrates that the purported justifications for the new policy stem from and are deeply rooted in hostility and prejudice against homosexuals as a group as opposed to any real concern with particular conduct. The military's true interest is in suppressing expressions of homosexual identity as opposed to protecting heterosexual service members' privacy or preventing sexual tension. In other words, as long as homosexual service members live in a state of secrecy (i.e., "in the closet"), they are eligible for service.

The unit cohesion rationale proffered by the Federal defendants in support of the "Don't Ask, Don't Tell" policy is nearly identical to the argument which was used by the military to justify the exclusion of African–Americans from military service. "For much of our history, the military's fear of racial tension kept black soldiers separated from whites. As recently as World War II both the Army chief of staff and the Secretary of

the Navy justified racial segregation in the ranks as necessary to maintain efficiency, discipline, and morale." *Watkins v. United States Army,* 875 F.2d 699, 729 (9th Cir.1989) (Norris, J., concurring); *see also Buttino v. FBI,* 801 F.Supp. 298, 302 n. 5 (N.D.Cal. 1992); *Cammermeyer,* 850 F.Supp. at 923; *Dahl v. Secretary of U.S. Navy,* 830 F.Supp. 1319, 1330 (E.D.Cal.1993).[24]

When President Truman courageously issued an Executive Order requiring the racial integration of the armed forces in 1948, he did so despite almost universal opposition from the military. *Watkins,* 875 F.2d at 729 n. 32. "Dire consequences were predicted for maintaining discipline, building group morale, and achieving military organization goals. None of these predictions has come true." *Dahl,* 830 F.Supp. at 1330 (quoting a 1988 study concerning gays commissioned by the DOD); *see also* William N. Eskridge, Jr., *Gaylegal Narratives,* 46 Stanford L.Rev. 607, 646 n. 57 (1994) (discussing parallels between arguments offered by the military to exclude African–Americans and gays). So too it is with the issue of homosexuals serving in the military. Once again, the military argues that it is entitled to deference in its decision to treat this country's citizens differently, not based on the merits of their qualifications or because of what they have done, but *because of who they are.* While this Court must be deferential to the decisions of the military, that deference is not absolute.[25]

■ The Federal defendants insist that "the Senate Committee specifically rejected the notion that the policy was based on irrational stereotypes, ..." (*See* Fed.Defs.' Reply at 10.) The Court is not so sanguine. The mere fact that Congress has denied any

24. Such justifications have also historically been used to rationalize discriminatory policies. *E.g., Plessy v. Ferguson,* 163 U.S. 537, 550, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (1896) (citing the promotion of the "public good" as a basis for upholding the "separate but equal" segregation of the races).

25. The danger of such unchecked deference is clearly demonstrated by decisions such as *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), *reh'g denied,* 324 U.S. 885, 65 S.Ct. 674, 89 L.Ed. 1435 (1945), which upheld the internment of Japanese American citizens in concentration camps during World War II. "That decision, justified by deference to the military's race-based judgment about the threat posed by Japanese Americans, is one of the Court's most embarrassing moments, and has been thoroughly repudiated by history." D. Cole and W. Eskridge, Jr., *From Hand–Holding to Sodomy: First Amendment Protections of Homosexual (Expressive) Conduct,* 29 Harvard C.R.–C.L. L.R. 319, 343 (1994); *see also Hirabayashi v. United States,* 828 F.2d 591, 593 (9th Cir.1987) (criticizing military's decision to separate Japanese–Americans).

**1534**

discriminatory motive, however, does not foreclose nor relieve this Court of its responsibility to assess the constitutionality of a given law or directive. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975) ("the mere recitation of a benign ... purpose is not an automatic shield which protects against any inquiry into the actual purpose underlying a statutory scheme."); *Lamprecht v. FCC,* 958 F.2d 382, 392 n. 2 (D.C.Cir.1992) ("If a legislature could make a statute constitutional simply by 'finding' that black is white, or freedom [is] slavery, judicial review would be an elaborate farce."). In addition, the Federal defendants' contention is highly suspect given the comments of Senator Exon, one of the members of the Senate Committee on Armed Services, who stated that the Committee was fearful of implementing "an unsatisfactory policy and that policy is a policy of open gays in the military, which a great number of us have very serious legitimate concern about." *See* S.Hrg. 103–845 at 777. Thus, it is evident that the true concern in drafting the policy was the *continued exclusion* of homosexual service members as opposed to the proscription of homosexual conduct.

 That some service members may dislike homosexuals, find their lifestyle immoral, or are otherwise uneasy in their company is *not* a constitutionally legitimate basis on which to ostracize an entire class of Americans from serving in this country's armed forces. Like African–Americans, homosexuals should not be barred from military service merely because *others* have irrational prejudices (which demonstrate a need for education).[26] Moreover, there can be no legitimate, rational basis for a policy which

forces citizens to lie and conceal their identity, simply to accommodate and submit to the bigotry of others.[27] While the Court acknowledges that the promotion of an effective military is a legitimate governmental interest, the Court finds that the new policy does not further that interest—and, in fact, severely detracts from it.

At bottom, despite the defendants' assertions to the contrary, *it is apparent that the new policy is purposefully directed at excluding homosexuals as a group.* The drafters of the new policy have merged the concepts of status and conduct in an attempt to circumvent the constitutional proscriptions articulated in *Meinhold.* The new policy does not penalize service members merely for engaging in homosexual conduct—it punishes them for simply acknowledging their status. As such, the Court summarily adjudicates plaintiff's federal equal protection claim in his favor.

### C. *First Amendment*

 Plaintiff's Ninth Claim for Relief alleges that defendants violated his rights to free speech and free expression which are protected under the First Amendment to the United States Constitution. *See* U.S. Const. amd. I. ("Congress shall make no law ... abridging the freedom of speech....") "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* —— U.S. ——, ——, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). Pure speech, no matter how offensive or controversial, is entitled to the highest protection. *See Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle underlying the First Amend-

**26.** The Bill of Rights is predicated on the notion that the rights of the minority must be protected from assault by the majority. *Wabol v. Villacrusis,* 958 F.2d 1450, 1462 (9th Cir.1990), *cert. denied sub nom.,* 506 U.S. 1027, 113 S.Ct. 675, 121 L.Ed.2d 598 (1992) (stating that "bold purpose" of the Bill of Rights is "to protect minority rights, not to enforce homogeneity."). The "Don't Ask, Don't Tell" policy violates this fundamental notion. By promulgating and seeking to enforce the ban on gays from the military, the military is officially sanctioning and encouraging homophobia.

**27.** By forcing homosexual service members to conceal their sexual orientation, the policy actually *undermines* the effectiveness of the military by potentially creating security concerns. By requiring homosexuals to live in a state of secrecy and constant fear of exposure, the policy creates opportunities for blackmail of those service members who wish to remain in service. *Cf., Watkins,* 875 F.2d at 731 (Norris, J., concurring) ("It is evident ... that homosexuality poses a special risk of blackmail only if a homosexual is secretive about his or her sexual orientation.")

ment, it is that the government may not prohibit expression of an idea simply because society finds the idea itself offensive or disagreeable."). "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, —— U.S. at ——, 115 S.Ct. at 2516.

 Although the protections of the First Amendment are generally broad, the Supreme Court has cautioned that "[judicial] review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws and regulations designed for civilian society." *Goldman*, 475 U.S. at 507, 106 S.Ct. at 1313 (holding that First Amendment did not prevent military from disallowing an Orthodox Jewish service member from wearing a yarmulke). Nevertheless, the military's need for discipline and order, which underlies such deference, does "not, of course, render entirely nugatory in the military context the guarantees of the First Amendment." *Id.* Therefore, in the context of the military, regulation of speech based on content survives constitutional scrutiny only if it is "no more than [what is] reasonably necessary to protect [a] substantial government interest." *Brown v. Glines*, 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540 (1980).

Here, there is no legitimate dispute that the Act and Directives are content-based, as they target service members who acknowledge their homosexuality. *See Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, —— U.S. ——, ——, 115 S.Ct. 2338, 2346, 132 L.Ed.2d 487 (1995); *accord Elzie v. Aspin*, 897 F.Supp. 1, 5 (D.C.Dist.1995). Nevertheless, the Federal defendants contend that the new policy does not impermissibly infringe on plaintiff's First Amendment rights. They argue that the new policy is directed at conduct, not speech, and that speech disclosing one's sexual orientation justifiably evidences the service member's likelihood of engaging in homosexual acts. The Federal defendants assert that under this rationale, the Ninth Circuit has

consistently rejected first amendment claims brought under the military's former policy.

These arguments lack merit. The current policy expressly provides that a service member's "*sexual orientation ... is not a bar* to service entry or continued service. Homosexual conduct, however, *is* grounds for separation from the Military Services." DOD Directive 1332.30 at 2–1 (emphasis added). While a service member's acknowledgement of orientation is *necessarily* evidence that he or she is a homosexual, it is not *necessarily* evidence that the service member is likely to engage in proscribed conduct in violation of military law. An acknowledgment of sexual orientation is nothing more than a verbalization of what the military has expressly stated is permissible. To conclude, as the Federal defendants urge, that disclosing one's homosexual orientation, in and of itself, has evidentiary significance beyond mere confirmation of one's sexual orientation would literally render hollow the military's express pronouncement—"a member's sexual orientation ... is not a bar to service entry or continued service." The member's statement of status only acquires independent significance by virtue of the presumption attached to that statement. As a result of this presumption, the statement confirming one's status becomes the proscribed "conduct" for which a service member may be discharged. *See Able*, 880 F.Supp. at 976 ("under the First Amendment a mere statement of homosexual orientation is not sufficient proof of intent to commit acts as to justify the initiation of discharge proceedings.").

The Court also finds the Ninth Circuit cases cited by the Federal defendants provide little support for their argument. Unlike this case, those cases were all decided under the military's *former* policy which *expressly* discriminated against homosexuals on the basis of their *orientation*. That distinction is significant because a statement of "I am gay" *is* direct evidence of the person's sexual *orientation*. *See Pruitt*, 963 F.2d at 1164. Since the express purpose of the current policy is to address *conduct* alone, the logic of those cases does not bar plaintiff's first amendment claim.[28]

---

**28.** The Federal defendants also assert that any

infringement on Lt. Holmes' first amendment

The Court concludes that the military's current policy discriminating against homosexuals violates plaintiff's rights under the First Amendment. The fact that the military attaches severe evidentiary significance to a statement of status demonstrates that the new policy is directed at *speech*, not conduct. Indeed, whether or not the homosexual service member ever actually engages in the conduct is, as a practical matter, inconsequential. Because the new policy infringes on Lt. Holmes' fundamental right to freedom of speech, the Court summarily adjudicates this claim in favor of plaintiff.

### D. *Substantive Due Process*

Lt. Holmes' twelfth claim for relief avers that he was discharged under the Act and Directives "based on his status as a gay man, rather than on the basis of his conduct" in violation of his substantive right to due process. (Am.Compl. ¶ 105.) Substantive due process guards against arbitrary and capricious governmental action. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1407 (9th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). "Substantive due process was the doctrine of choice for the protection of fundamental rights during the first half of this century, although it now has largely been replaced by other constitutional doctrines." *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 945 n. 29 (9th Cir.1995) (en banc), *cert. granted*, — U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996).

The rights plaintiff seeks to vindicate through his substantive due process claim are duplicative of those asserted in his equal protection and first amendment claims. As those constitutional provisions more specifically address the rights plaintiff seeks to vindicate, the Court concludes that dismissal of plaintiff's substantive due process claim is appropriate. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (improper to analyze excessive force claim under substantive due process where specific constitutional provi-

sion applicable); *Armendariz v. Penman*, 75 F.3d 1311, 1318 (9th Cir.1996) (finding that "the plaintiff's substantive due process claim fails because it is preempted by other constitutional claims under the rule of *Graham....*").

### E. *Remaining Claims*

The defendants move for dismissal of Lt. Holmes' claims that the policy violates his right to intimate associations, the policy is vague and overbroad, and that the policy violates his right to privacy. Plaintiff offers no meaningful response in opposition to the dismissal of these claims. Therefore, the Court dismisses plaintiff's Tenth, Eleventh and Thirteenth Claims for Relief.

### *CONCLUSION*

Defendants separated Lt. Holmes from the state and federal national guards solely because of who he is, and not for anything he had done. Despite their stated goal of proscribing homosexual conduct while ostensibly permitting homosexuals to serve, the Act and Directives target and punish service members who simply acknowledge who they are. This is impermissible under our Constitution. Accordingly,

IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion to strike the California defendants' untimely opposition is GRANTED.

2. Plaintiff's cross-motion for summary adjudication is GRANTED with respect to his federal equal protection and freedom of speech claims. Plaintiff's motion is DENIED in all other respects.

3. The Federal defendants' motion to dismiss is GRANTED with respect to plaintiff's federal claims based on vagueness and overbreadth, substantive due process, intimate associations, and the right to privacy. The Federal defendants' motion is DENIED in all other respects.

4. The California defendants' motion to dismiss is DENIED with respect to plaintiff's federal equal protection and freedom of

---

rights is justifiable because homosexual conduct impairs military readiness. (*See* Fed.Defs.' Mot. at 18.) However, this argument fails for the

reasons previously discussed in the context of plaintiff's equal protection claim.

speech claims, and is GRANTED in all other respects. Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE to plaintiff bringing them in the appropriate state forum.

5. Defendants shall reinstate Lt. Holmes to the CANG and restore his federal officer status in the USANG. Defendants are permanently enjoined from further proceedings against Lt. Holmes based on the Act and Directives as set forth above.

IT IS SO ORDERED.